**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**MARQUETTE TRANSPORTATION**            **CIVIL ACTION**
**COMPANY GULF-INLAND, LLC**

**VERSUS**                                              **NO:     13-6216**

**M/V CHEMBULK WESTPORT, ET AL.**         **SECTION: "A" (4)**

<u>**ORDER**</u>

Before the Court is Defendant, Mi-Das Line S.A's ("Mi-Das") **Motion to Compel (R. Doc. 100)**, seeking a court order compelling an operational inspection of the M/V CAPTAIN PETE, which is owned by third party defendant, Weeks Marine, Inc. ("Weeks Marine"). The motion is opposed. *See* R. Doc. 102. The motion was heard for oral argument on Wednesday, July 15, 2015.

**I.      <u>Background</u>**

This action arises out of the capsizing of Marquette's vessel, the M/V KRISTEN ALEXIS. *See* R. Doc. 1, at 3. Marquette alleges that on or about October 22, 2013, the KRISTEN ALEXIS was moored in the New Orleans harbor when Mi-Das's vessel, the M/V CHEMBULK WESTPORT, was operating at high speeds in the harbor causing the KRISTEN ALEXIS to capsize after it was flooded from the wake of the CHEMBULK WESTPORT. *Id*. at 2-3.

Marquette filed this action on October 22, 2013 alleging that the damages it sustained from the capsizing of the KRISTEN ALEXIS are estimated at $1,200,000. In Mi-Das's answer to the complaint, it asserted a third party action against Weeks Marine and its vessel the CAPTAIN PETE. *See* R. Doc. 11. Mi-Das alleges in its third party complaint that it was not responsible for the capsizing of the KRISTEN ALEXIS, but rather, Weeks Marine was responsible. *Id*. at 5-6. Mi-Das alleges that the CAPTAIN PETE was operating in close proximity to the KRISTEN ALEXIS immediately before it was capsized. *Id*.  Mi-Das seeks

indemnity from Weeks Marine in the event that it is held liable to Marquette, and in the alternative, alleges that the CAPTAIN PETE was a superseding cause and is contributorily negligent. *Id*. at 7.

In the instant motion, Mi-Das seeks a court order compelling Weeks Marine to permit an operational inspection of the CAPTAIN PETE to show the CAPTAIN PETE operating at the speeds it was going when it passed the KRISTEN ALEXIS shortly before it capsized. *See* R. Doc. 100, p. 1. Mi-Das contends that satellite imagery demonstrates that the CAPTAIN PETE passed the KRISTEN ALEXIS at the same time as the CHEMBULK WESTPORT but in much closer proximity. *See* R. Doc. 100-1, p. 1. Therefore, Mi-Das contends that an operational inspection is essential to determine the size of the wake of the CAPTAIN PETE at the time it passed the KRISTEN ALEXIS. *Id*.

## II.   <u>Standard of Review</u>

Federal Rule of Civil Procedure ("Rule") 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The Rule specifies that "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."   *Id.*   The Court notes that the discovery rules are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials. *Herbert v. Lando*, 441 U.S. 153, 176 (1979).  Nevertheless, discovery does have "ultimate and necessary boundaries."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).   Furthermore, it is well established that the scope of discovery is within the sound discretion of the trial court. *Burns v. Thiokol Chemical Corp.*, 483 F.2d 300 (5th Cir. 1973).

Under Rule 26(b)(2)(C), discovery may be limited if: (1) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from another, more convenient, less burdensome, or less expensive source; (2) the party seeking discovery has had ample opportunity to obtain the discovery sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit. *Id.* In assessing whether the burden of the discovery outweighs its benefit, a court must consider: (1) the needs of the case; (2) the amount in controversy; (3) the parties' resources; (4) the importance of the issues at stake in the litigation; and (5) the importance of the proposed discovery in resolving the issues. Fed. R. Civ. P. 26(b)(2)(C)(iii).

Rule 34 provides that a party may request another party "to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property." Fed. R. Civ. P. 34(a)(2). This request "must describe with reasonable particularity each item or category of items to be inspected." Fed. R. Civ. P. 34 (b)(1)(A). "The party to whom the request is directed must respond in writing within 30 days after being served." Fed. R. Civ. P. 34(b)(2)(A). "For each item or category, the response must either state that inspection . . . will be permitted as requested or state an objection to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B). Although Rule 34 does not provide that untimely objections are waived, the Fifth Circuit has found that the waiver provision applies equally to Rule 34. *See In re United States*, 864 F.2d 1153, 1156 (5th Cir. 1989).

**III.   <u>Analysis</u>**

Mi-Das argues that an operational inspection of the CAPTAIN PETE is important because no eyewitness saw which vessel generated the wave. *See* R. Doc. 100-1, p. 1. Mi-Das contends, however, that it has objective evidence from its Automated Identification System

3

("AIS")[1] demonstrating that the CAPTAIN PETE was at full speed while approaching the KRISTEN ALEXIS, then slowed down before passing the vessel, but sped up before she actually passed the KRISTEN ALEXIS. *Id.* at 3. Mi-Das contends that the deposition of the pilot of the CAPTAIN PETE confirms the vessel's change in speed because he testified that he was going full speed when approaching the vessel, slowed down to pass it, and sped up after he passed. *Id.* at 4.

Mi-Das further argues that, according to its experts, a vessel's speed is an important factor in determining the size of the vessel's wake and that a crewboat such as the CAPTAIN PETE creates its largest wake when it is speeding up from a slower speed to a full speed, which happened during the incident. *Id.* at 3. Mi-Das contends that an operational inspection of the CAPTAIN PETE going at the speed progression shown on the AIS would provide valuable evidence. *Id.*

Additionally, Mi-Das contends that there are several videos showing the actual wake of the CHEMBULK WESTPORT on the day of the incident at the speed she was going when she passed the KRISTEN ALEXIS but there is no comparable objective evidence showing the wake of the CAPTAIN PETE. *Id.* at 4. Mi-Das avers that its experts are unable to give a final opinion on the CAPTAIN PETE because they have not been able to inspect it and observe it operating at the speeds depicted by the AIS. *Id.* However, Mi-Das contends that Weeks Marine's experts have viewed the CAPTAIN PETE in operation, although it was at less than full throttle. *Id.* at 5.

In opposition, Weeks Marine contends that there is no evidence demonstrating that the CAPTAIN PETE created any sort of wake, but there is evidence proving that the vessel reduced its speed while passing the KRISTEN ALEXIS. *See* R. Doc. 102, p. 1. Weeks Marine represents

---

[1] The Automatic Identification System (AIS) is an automatic tracking system used on ships and by vessel traffic services (VTS) for identifying and locating vessels by electronically exchanging data with other nearby ships. See https://en.wikipedia.org/wiki/Automatic_Identification_System

that the captain of the KRISTEN ALEXIS, Captain Thibodaux, stated that he recalled the CAPTAIN PETE passing the KRISTEN ALEXIS the morning of the incident and stated that the vessel slowed down when it passed. *Id*. at 2. When the vessel was capsized, Weeks Marine contends that the captain of the KRISTEN ALEXIS stated that he looked down the river and saw the CHEMBULK WESTPORT, commenting that the wave could have only been from the CHEMBULK WESTPORT. *Id*. at 3.

Weeks Marine contends that its captain, Captain Jones, testified that the CAPTAIN PETE was traveling no faster than 10.4 knots when it passed the KRISTEN ALEXIS and that it didn't speed up to 16.9 knots until it was passed the KRISTEN ALEXIS. *Id*. at 4. Weeks Marine further argues that it was at a ninety degree angle to the KRISTEN ALEXIS and that its wake would have come off at an angle and not directly behind CAPTAIN PETE, thus its wake could not have hit the KRISTEN ALEXIS because it would have been angled.  *Id*. Weeks Marine also argues that it offered to allow Mi-Das to inspect the vessel operating at idle speed, similar to the inspection done by its own experts. *Id*. at 5. Weeks Marine argues that Mi-Das rejected the offer because it wanted to operate the vessel at full speed, but Weeks Marine contends that operation at full speed is irrelevant because the speed the CAPTAIN PETE was traveling before and after it passed the KRISTEN ALEXIS is not relevant. *Id*. Weeks Marine represents that it will also agree to not use its video of the CAPTAIN PETE operating. *Id*.

Furthermore, Weeks Marine argues that although Mi-Das contends there are videos of the CHEMBULK WESTPORT, the two videos do not equate to an operational inspection. *Id*. at 6. Weeks Marine also asserts that the CAPTAIN PETE appears in the same Coast Guard video of the CHEMBULK WESTPORT, and if that video is good enough for Mi-Das it should be good enough for Weeks Marine. *Id*. Weeks Marine further contends that if Mi-Das is allowed to

inspect the CAPTAIN PETE, Mi-Das should insure the value of Weeks Marine's deductible on its hull policy should anything happen during the inspection. *Id*. at 7.

Under Rule 26, the primary inquiry is whether the information sought is relevant to a claim or defense. In determining whether an inspection is relevant, some courts have "balance[d] the respective interests by weighing 'the degree to which the proposed inspection will aid in the search for truth' against the 'burdens and dangers created by the inspection.'" *Lykins v. CertainTeed Corp.*, No. 11-2133-JTM-DJW, 2011 WL 6337631, at *4 (D. Kan. Dec. 19, 2011); *see also Mobley v. Edison Chouest Offshore, Inc*., No. CIV. A. 95-3120, 1996 WL 363496, at *1 (E.D. La. June 27, 1996) (Wilkinson, M.J.) (finding that the logistical burdens imposed by an inspection and video taping of the certain offshore operations would outweigh the benefits of the inspection).

Here, Weeks Marine has not indicated that it would be subjected to any hardships if the inspection is allowed, but it requests that Mi-Das insure the value of its deductible on its hull policy should anything happen during the inspection. Weeks Marine's primary risk appears to be associated with the liability it would be exposed to if something were to go wrong. During oral argument, however, the parties came to the agreement that Mi-Das would provide a deductible hull policy for the inspection, which would provide the same coverage as Weeks Marine's hull policy and will cover the $300,000 deductible. Thus, the parties' agreement on the insurance policy reduces Weeks Marine's concerns about the liability coverage for the inspection.

As for determining the benefit to Mi-Das, the Court looks to the relevance of the information sought. Mi-Das seeks to determine if the CAPTAIN PETE could have created a wake going at the speeds reported on the AIS. Mi-Das's expert attested to the possibility that the CAPTAIN PETE could have made the wake going at the speeds depicted on the AIS but contends that he cannot make a final decision without performing an inspection. *See* R. Doc.

100-2, pp. 7-8 (Darden aff. ¶¶10-11). The expert further states that an inspection is important because the vessel's construction is another important factor in determining the size and characteristic of the wake. *Id*. at 8 (Darden aff. ¶11).

Additionally, a review of the AIS imagery shows that the CAPTAIN PETE was going 20.9 knots before it reached the KRISTEN ALEXIS, slowed down to 10.4 knots right before it reached the KRISTEN ALEXIS, sped back up to 16.9 knots when it was side by side with the KRISTEN ALEXIS, and sped all the way up to 22.2 knots when it was passed the KRISTEN ALEXIS. *See* R. Doc. 100-2, pp. 1-4. Based on the AIS imagery, the Court determines that an operational inspection is relevant to Mi-Das's third party action against Weeks Marine and to Mi-Das's defense against Marquette's claim against it.

Moreover, the Court also notes that the captain of the CAPTAIN PETE testified that he always slowed down to five to seven knots when he passed the KRISTEN ALEXIS. The captain also testified that he sped up to full throttle, or 21 knots, after he passed. Nonetheless, the Court recognizes that his testimony will need to be weighed by the trier of fact and not by this Court in determining the relevance of discovery. Consequently, the Court finds that the testimony is not uncontroverted evidence that renders the operational inspection irrelevant.

As such,

**IT IS ORDERED** that Mi-Das Line S.A's **Motion to Compel (R. Doc. 100)** is **GRANTED.**

New Orleans, Louisiana, this <u>20th</u> day of August 2015.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**